IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 14, 2015 Session

## STATE OF TENNESSEE v. WILLIAM THOMAS UMFLEET

**Appeal from the Circuit Court for Hardin County**
**No. 9697     C. Creed McGinley, Judge**

---

**No. W2014-00024-CCA-R3-CD  -  Filed September 16, 2015**

---

The defendant, William Thomas Umfleet, appeals his Hardin County Circuit Court jury conviction of first degree premeditated murder, claiming that the evidence was insufficient to support his conviction. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Robert Thomas, Jackson, Tennessee, for the appellant, William Thomas Umfleet.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Hansel J. McAdams, District Attorney General; and Beth Boswell-Hall and James E. Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Hardin County Circuit Court Grand Jury charged the defendant with one count of first degree premeditated murder for the death of the victim, Thomas Michael "Doodle" Dickson, in Savannah.

The evidence adduced at the defendant's August 2013 trial established that the defendant had previously purchased drugs from the victim and that the two men often consumed drugs together in the victim's home.

On May 5, 2012, the victim telephoned the Huddle House in Savannah to order breakfast at 2:35 a.m. Shortly thereafter, the defendant telephoned the victim and

asked the victim to pick him up. The victim picked up his food from the Huddle House at 2:52 a.m., and he told a waitress there that she should tell anyone who called to "ask if he had come and picked up his food, that he had already picked it up . . . and that he had already left the Huddle House." At some point, the victim picked up the defendant, and the two men went to the victim's residence, where they consumed drugs and alcohol. Toxicology results from the victim's autopsy showed that the victim's blood alcohol level was .06 percent and that his blood contained diazepam, alprazolam, cocaine, methadone, dihydrocodeine, hydrocodone, and hydromorphone.

At approximately 4:00 a.m., Cindy Davis saw a man she later identified as the defendant walking along the road near St. John's Baptist Church. The defendant's cellular telephone records established that he telephoned Joey Hinson from a picnic bench on Graham Street after 4:00 a.m. Lori Ann Davis, a friend of both the defendant and the victim, saw the defendant walking along Handy Street sometime between 4:00 a.m. and 5:00 a.m., and the defendant did not speak to her even after she called his name, which unnerved her. Ms. Davis later saw the defendant standing beside a picnic table on Graham Street.

When Brandi Jennings, an employee of the Quik Mart, reported for her 5:30 a.m. shift on May 5, 2012, she saw a man she later identified as Joey Hinson sitting on a milk crate outside the store talking on a cellular telephone. Ms. Jennings also saw a man she later identified as the defendant pacing in front of the Walgreen's "across the road on a cell phone." The two men "met up in the [Quik Mart] parking lot not too long after." The defendant "had a bag or a satchel or something slung over his shoulder" and he wore a sling. He "put the bag in a garbage can at the gas pumps," and then the men came into the store. After the men left the store at 6:18 a.m., the defendant retrieved the bag from the garbage can and walked in the direction of the liquor store.

Colton Blake Hudson saw the defendant at the home of Mr. Hudson's mother, Darlene Hottiman, sometime between 9:00 a.m. and 10:00 a.m. on May 5, 2012. Mr. Hudson allowed the defendant to come into the house to wash his hands at the kitchen sink, but, because Ms. Hottiman was not home, Mr. Hudson did not allow the defendant to stay inside the house after Mr. Hudson left. He did allow the defendant to remain on the porch. Later that same day, Mr. Hudson found "a shiny silver watch" lying next to the sink in Ms. Hottiman's kitchen that had not been there earlier in the day. Mr. Hudson gave the watch to his boyfriend. Later, after they overheard Savannah Police Department Investigator Tim Keen talking about a watch while he was in a local jewelry store, Mr. Hudson and his boyfriend gave the watch to Investigator Keen.

The defendant and Mr. Hinson arrived at the residence that Robert "Weedy" White shared with his elderly mother sometime between 10:00 a.m. and noon

on May 5, 2012. The defendant's brown checked shirt "was wet because it was hot and he was sweating profusely," so he hung the shirt on Mr. White's mailbox to dry. The defendant and Mr. Hinson both walked around to the side of Mr. White's house. After Mr. White told police officers about his interaction with the defendant and Mr. Hinson on May 5, 2012, investigators went to the side of the house and discovered a yellow Dollar General bag and a pair of gloves that did not belong to Mr. White inside the trash can located there.

Oren Hancock and Pam Lester, with whom the defendant had been living, went to the victim's house at approximately 11:30 a.m., and they found the house "eerily" quiet. Ms. Lester knocked on the victim's door but got no answer. Mr. Hancock and Ms. Lester then drove to Mr. White's house, where they saw Mr. Hinson and the defendant. They then drove Mr. Hinson and the defendant to the home of Sonia "Punk" Price. The defendant left his brown checked shirt inside Mr. Hancock's vehicle, and Mr. Hancock later gave the shirt to the police.

On the afternoon of May 5, 2012, the victim's neighbor, Max Walker, walked to the victim's house to deliver a meal of leftovers to the victim. Kenny Wesson, who was standing in the victim's driveway, told Mr. Walker, "'I've hollered all throughout the house and he's not in there. He's not here.'" Mr. Walker then noticed that the victim's front door had been "broken open" and that the victim's dog, a pitbull/Rottweiler mix that was known to be vicious to strangers and protective of the victim, was loose rather than confined, as was generally the victim's custom. Mr. Walker stepped toward the victim's house, stuck his head in the door, and "hollered" for the victim. When he received no response, Mr. Walker stepped into the house to let the victim's dog inside, and he observed the victim's body lying in the hallway. Mr. Walker then returned to his own house to telephone 9-1-1.

Savannah Police Department Officer Wesley Murphy responded to Mr. Walker's 9-1-1 call. He first encountered the victim's dog, which became aggressive and drove the officer back into his cruiser. Mr. Walker, who was familiar with the dog, was able to contain the dog so that officers could go inside the victim's home. Inside, officers found the victim's body lying in the hallway; a hammer was protruding from the back of the victim's head. Blood spatter covered the walls, and papers were strewn throughout the house, including the area nearest the victim's body. The victim's pockets had been turned out.

Crime scene investigators from the Tennessee Bureau of Investigation ("TBI") took photographs, measurements, and video, and collected evidence from the scene. In particular, investigators observed shoe tracks in several areas, some on papers that were very near the victim's body, and collected those. Investigators also collected a

-3-

hammer from the front door area of the victim's home and a hammer from the victim's head. The evidence collected from the scene was sent to the TBI laboratory for testing.

Testing of the items collected from the victim's house yielded few identifiable fingerprints, none of which belonged to the defendant. Deoxyribonucleic acid ("DNA") testing of those items collected during the investigation also yielded few results. The defendant's brown checked shirt tested positive for the presence of blood, and DNA testing established that "that particular item was a mixture of genetic material from at least two individuals; the major contributor to the profile . . . was [the defendant] . . . . [a]nd the minor contributor" was the victim. Testing on the gloves collected from Mr. White's residence indicated the presence of blood but failed to indicate the presence of human DNA. Testing on the Dollar General bag collected from the White residence tested positive for the presence of blood and human DNA, but the DNA was insufficient or too degraded to yield a profile.

TBI Agent and Forensic Scientist Miranda Gaddes compared the shoe impressions discovered inside the victim's residence with the shoes collected from the defendant, Mr. Walker, and the officers and medical personnel who responded to the scene. In total, 16 of the 25 impressions or partial impressions were consistent with the black Skecher's Shape Up shoes collected from the defendant, including some that were discovered near the victim's body and the murder weapon. None of the shoe impressions came from the shoes worn by the victim or from the shoes worn by Mr. Walker.

Doctor Thomas Deering, who conducted an autopsy of the victim, determined that the cause of the victim's death was "multiple modality trauma." The victim suffered seven stab wounds to the left neck, including an "injury to the left c[a]rotid artery" and "an incised wound to the anterior laryngeal cartilage, the voice box." "[A] very large laceration to the left posterior aspect of the" victim's head evinced "blows to the head that have ripped through the scalp, that have severely fractured the skull and have intruded into the cranial cavity and actually struck the brain and lacerated the brain." The victim's "skull [was] obviously fractured," and his brain could be seen through the "gaping" hole, exposing "open lacerations" to the brain. Other autopsy findings indicated that the victim was alive when some of the blows were struck to the brain itself. Additionally, the right side of the victim's head bore "multiple scrapes and bruises," and he had "bilateral periorbital hemorrhages; two black eyes." "[B]ruises to the multiple strap muscles of the neck" and a fractured hyoid bone indicated the possibility of manual strangulation. The victim also suffered multiple "scrapes and bruises to the lower extremities, the legs, particularly around the knees" and to "[t]he left forearm, the right upper arm, his lower belly area, the lower abdomen, and the right middle chest."

While the police were at the victim's residence investigating, Darlene Hottiman arrived on the scene and communicated to Investigator Keen that the defendant had threatened the victim's life in the days before the murder. The defendant told Ms. Hottiman "that he had got some bad drugs from [the victim] [that] made him sick." The defendant said that he "'ought to kill the son of a b****'" before saying, "'I will kill the son of a b****.'" Based upon this information, Investigator Keen telephoned the defendant and asked if he would agree to speak to the police. The defendant agreed and asked for a ride to the police station.

During his May 5, 2012 interview, the defendant told TBI Agent Terry Dicus that he and the victim were "associates, . . . not necessarily friends. They were drug associates, that every time he would get high with [the victim, the victim] would start agitating him. He was agitating, annoying, arrogant." The defendant said that "he had called [the victim] the night before. [The victim] had picked him up, they went to the Huddle House, then they went over to his house and they both used drugs." He said that they "smoked crack and shot up some dope" and that "he purchased $150 worth of K4 Dilaudid from [the victim]." He told Agent Dicus that "that morning [the victim] made him mad, so he left and went . . . to go to the next place to get drugs." The defendant said that he left the victim's residence at 5:00 a.m. and that the victim was alive when he left. Agent Dicus collected the clothing that the defendant was wearing: "a Stone Cold Steve Austin shirt, black in color, a pair of blue jean shorts, a black belt, and black Skechers Shape Up tennis shoes." The defendant told Agent Dicus that he had been wearing the same clothes when he was with the victim.

In a later interview, the defendant provided the following description of his whereabouts on the morning of May 5, 2012:

> He went from [the victim's residence], across the field to . . . the area of St. John's Baptist Church. He went from there, from that area up to Darlene Hottiman's where he had . . . a bag of some CD's and other things behind her house. He picked that up.

> Then he walked back across . . . the highway to a picnic table at Daryl and Mary's house. He stayed at the picnic table until 5:35 when Joey Hinson called him and said, 'Hey, let's go. I got a wad of money. Let's go get some drugs.'

> He left the picnic table and went back south to Quik Mart and met up with Mr. Hinson. They went from Qui[]k

Mart to Punky Price's house, Sonia Price, and went to her
house.

They left there and went to . . . Weedy White's house.

The defendant also told Agent Dicus that it was possible that a small amount of the victim's blood might be on his clothing, explaining, "'We, you know – we shoot dope, we do needles. And sometimes, you know, I may have come across and his blood got on me somehow.'" During that same interview, Agent Dicus asked the defendant if he had worn gloves while inside the victim's house. The defendant denied having done so. Immediately following that interview, Mr. White's daughter, Brandy Henderson, saw the defendant come into her grandmother's yard "bent down . . . walking fast . . . between" two vehicles in a manner that made it appear that he was trying to avoid being seen. "He went straight to the garbage can at the side of the house." At that point, Ms. Henderson stepped outside and saw the defendant "[a]t the corner of the house with his hand on the garbage can."

A few days later, Candace Smith was sitting in her truck smoking a cigarette when the defendant approached her and asked for a cigarette. As they talked, the defendant asked, "'How does it feel talking to a murderer?'"

During a May 14 interview with Agent Dicus, the defendant "said that he had been . . . thinking about it, and somebody could have c[o]me over to the house and waited on [the defendant] to leave and as soon as [the defendant] left, you know, . . . they jumped out and got ahold of" the victim. The defendant also told Agent Dicus that he had heard another individual threaten to bash the victim's head in. Additionally, the defendant said that he had used a claw hammer from the victim's residence to help the victim repair his door. The defendant denied having ever gone anywhere inside the victim's house other than the living room and kitchen. He specifically denied having been in the area where the victim's body was found.

In an interview conducted on the following day, Agent Dicus confronted the defendant with the results of the forensic testing conducted by the TBI. When confronted with the results of shoe impression comparisons, the defendant again denied going into the area near the victim's body. The defendant insisted that the victim was alive when he left the victim's house. When confronted with the DNA results showing a mixture of his and the victim's blood on his shirt, the defendant denied ever having shared a needle with the victim and maintained that the presence of the victim's blood on his shirt was "inexplicable."

Following his arrest, the defendant was incarcerated in the Hardin County

Jail, and during his incarceration, he shared a cell with Matthew Moody. The defendant told Mr. Moody that the victim "had ripped him off on some pills" and that "he had planned it out and went over there to get even with" the victim. The defendant told Mr. Moody that when he first arrived at the victim's house on the night of the murder, the two men "sat on the couch and got high together, shot up. And later on, sometime that night, he had wrapped hi[m]self up in something, hit him in the head with a hammer and bludgeoned him." The defendant also told Mr. Moody that he stabbed the victim and that he had checked the victim's pockets in an effort to recover the $150 he had paid the victim for the counterfeit drugs. The defendant expressed concern because although he had worn gloves during the offense, he could not recall whether he wore gloves when he checked the victim's pockets. The defendant told Mr. Moody that "[h]e buried everything after he was done" and that he had gone to the Shell Station because "he wanted to make sure that he was seen on camera wearing the clothes . . . he had on earlier that day."

The defendant also confessed his crime to fellow inmate Gregory Gray, telling Mr. Gray that the victim "owed him money and he collected" by "bludgeoning" the victim "[w]ith a hammer." The defendant told Mr. Gray that he had worn gloves during the offense and that the authorities had "found the wrong gloves." The defendant bragged that although he made shoe prints around the victim's body, he had done so using "Skechers women's shoes." The defendant said "that he cleaned up the crime with acetone" and that his clothing had been "washed with acetone" because "acetone would take care of anything." The defendant told Mr. Gray that he did not believe that he would be convicted "[b]ecause it was the perfect crime."

Based upon the proof presented, the jury convicted the defendant as charged of first degree murder. The trial court approved the verdict as 13th juror and imposed the automatic sentence of life imprisonment.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence, claiming that the State failed to establish the necessary element of premeditation, that the State failed to establish his identity as the perpetrator, and that the testimony of Messrs. Moody and Gray was not credible.[1]

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

---

[1] The defendant's claims that the trial court should have either vacated the jury's verdict in its role as 13th juror or granted his motion for a judgment of acquittal are actually challenges to the sufficiency of the convicting evidence.

crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another."  T.C.A. § 39-13-202(a).

*Premeditation*

Code section 39-13-202 explains:

> As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d).  Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime."  *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007).  Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing, *see, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001), including "the use of a deadly weapon upon an

unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

In this case, just days after the defendant threatened to kill him, the victim was stabbed seven times, bludgeoned with a hammer, and possibly strangled. Doctor Deering explained that the victim was struck repeatedly with the hammer, even after one blow broke the victim's skull open, exposing his brain. Some of the blows to the victim's brain occurred while the victim was still alive. The evidence indicated that the victim was unarmed. Shortly after the victim's murder, the defendant was seen walking around, and he did not appear to be agitated. The defendant told Messrs. Moody and Gray that he had planned the victim's murder as retaliation for selling him steroid pills instead of narcotics and that he had been careful to avoid leaving any forensic evidence of his guilt. This evidence overwhelmingly supports the jury's finding that the victim's murder was premeditated.

*Identity*

The defendant also challenges the sufficiency of the convicting evidence on grounds that the autopsy showed that the victim was alive when the defendant left the victim's residence at 4:00 a.m. on May 5, 2012. He also claims that the lack of DNA evidence does not support a conclusion that he killed the victim. At bottom, these claims are a challenge to the State's proof of the defendant's identity as the perpetrator.

At trial, Doctor Deering described the victim's stomach contents as "500 milliliters or a half a liter of tan chime" and "portions of partially digested food," including "recognizable carrots, kernels of corn, onions, pea pod shells, and peas." The defendant asserts on appeal that this testimony established that the victim consumed another meal after eating the breakfast items that he picked up from the Huddle House. He argues that "[i]t stands to reason that this meal was consumed after the [d]efendant departed from the residence, which would indicate that the victim was alive and well when the [d]efendant last saw him." Although the jury, in its province as fact finder, could have made such an inference, we are not permitted on appeal to substitute any inference for those conclusions made by the jury. *See Dorantes*, 331 S.W.3d at 379.

Additionally, the defendant contends that the lack of DNA evidence indicates his innocence. He argues that given the gruesome nature of the crime committed against the victim, "the fact that there would be such small traces of blood and/or human DNA on only two items of [the defendant's] clothing defies logical reasoning if it is to be believed that the [d]efendant committed this crime." Again, we

decline the defendant's invitation to re-weigh the evidence presented or substitute our own factual conclusions for those drawn by the jury. *See id.* The evidence presented established that the victim picked the defendant up sometime after 2:30 a.m. on May 5, 2012, and was never seen alive again. Shoe impressions from the victim's residence, including those discovered nearest the victim's body, matched the shoes worn by the defendant, despite that the defendant maintained that he had never gone into that area of the victim's house. The defendant threatened the victim's life just days before the murder, and then he confessed the murder to two different Hardin County Jail inmates. The defendant told Messrs. Gray and Moody, on different occasions, that he had planned the victim's murder as retaliation for the victim's selling him counterfeit narcotics. He explained in detail how he had gone to great lengths to avoid leaving any forensic evidence behind. In spite of the defendant's efforts, forensic testing revealed a small amount of the victim's blood on the defendant's shirt. Additionally, after Agent Dicus asked the defendant whether the defendant had worn gloves while at the victim's residence, the defendant went immediately to the trashcan outside Mr. White's residence where the police had discovered a pair of gloves. This evidence was sufficient to support the jury's conclusion that the defendant murdered the victim.

*Witness Credibility*

Finally, the defendant asserts that the testimony of Messrs. Gray and Moody was "not credible given the conflicts present therein and their self-serving motives in offering said testimony." The determination of witness credibility lies squarely within the province of the jury, and, in this case, the jury clearly accredited the testimony of these two witnesses. This court is not free to revisit this conclusion.

In sum, the evidence adduced at trial was sufficient to support the defendant's conviction of the first degree premeditated murder of the victim. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE